Deborah Rosenthal Cal. Bar No. 184241
SIMMONS HANLY CONROY LLP
455 Market Street, Suite 1270
San Francisco, California 94105
Telephone: (415) 536-3986
Facsimile: (415) 537-4120
drosenthal@simmonsfirm.com

***Additional Counsel on Signature Page***

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

DOUGLAS K. NEVITT, on behalf of himself and all others similarly situated,

    Plaintiff,

v.

LPL FINANCIAL HOLDINGS INC. and LPL FINANCIAL LLC,

    Defendants.

Case No. **'24CV1358 RBM KSC**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, on behalf of himself and the proposed Class defined herein, seeks redress for the harm caused by Defendants' conduct. In support of his Complaint, Plaintiff alleges the following:

### I.   NATURE OF ACTION

1.    This case concerns a simple ruse: in violation of its fiduciary duties and a regulatory mandate to act only in the "best interests" of its clients, Defendants fail

to secure for their brokerage and advisory clients reasonable interest rates on their clients' cash balances. Instead, Defendants implement a scheme whereby those clients' cash balances are used by Defendants to generate massive profits for themselves based primarily on prevailing market rates. During the rising interest rate environment from March 2022 through the present, the spread between what Defendants paid to or secured for its clients and what it made in the market, known as "net interest income," has grown exponentially: from 2022 to 2023, Defendants' net interest income increased by 107%.

2.    While that growth was and continues to be extremely lucrative for Defendants, Defendants' scheme was and continues to be extremely detrimental to its clients—in flagrant violation of its duties to its clients.

## II.    JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction under the Class Action Fairness Act, codified at 28 U.S.C. § 1332(d). Plaintiff is diverse from Defendants and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

4.    This Court has personal jurisdiction over Defendants because they conduct substantial business in this district and have their principal places of business here.

5.    Venue is proper in this district under 28 U.S.C. § 1391.

CLASS ACTION COMPLAINT

# III.    PARTIES

## A. Plaintiff

6.      Plaintiff, Douglas Nevitt, is a 66-year-old Illinois resident who worked most of his adult life in construction. Mr. Nevitt maintained an individual retirement account (ending in 64) at LPL Financial LLC from 2020 through 2022.  Mr. Nevitt's retirement account was a managed, advisory account. In the account maintained by Mr. Nevitt with LPL Financial LLC, Mr. Nevitt's cash balances were swept into LPL's cash sweep program.

## B. Defendants

7.      LPL Financial Holdings Inc. is a Delaware corporation with its principal place of business in San Diego, California.

8.      LPL Financial Holdings Inc. provides financial consulting, wealth management, and advisory services to Plaintiff and other Class members (as defined herein), and it substantially assisted, encouraged, directed, participated in, and received the benefits of the wrongful conduct alleged herein that was conducted primarily by LPL Financial LLC.

9.      LPL Financial LLC is a Delaware limited liability company with its principal place of business in San Diego, California.

10.     LPL Financial LLC is a registered broker-dealer with the Securities and Exchange Commission ("SEC") and a registered investment adviser with the SEC,

and its relationship with its clients is subject to the fiduciary and regulatory obligations imposed on investment advisers. It provides wealth management services to Plaintiff and other Class members.

11.    As used herein, the term "LPL" collectively refers to LPL Financial Holdings Inc. and LPL Financial LLC.

## IV.    FACTUAL ALLEGATIONS

12.    LPL is a Fortune 500 company that "serves the advisor-mediated marketplace as the nation's largest independent broker-dealer [and] a leading investment advisory firm . . . ."[1]

13.    A significant source of income for LPL is net interest income, meaning the difference between the amount of interest that LPL pays to or secures for its brokerage and advisory clients and the amount of interest that LPL earns on those cash balances.

14.    LPL makes more money when its clients' funds are invested in the LPL cash sweep program rather than in similar cash options and equivalents.

15.    When clients are in the LPL cash sweep program, LPL pays and/or secures rates of interest on the client's cash balances that are neither reasonable nor in compliance with its legal duties.

---

[1]    LPL Financial Holdings Inc., 2023 Annual Report (Form 10-K) at p. 1 (Feb. 21, 2024).

**A. LPL's Automatic Cash Sweep Program**

16.    Under LPL's automatic cash sweep program ("ACSP"), LPL, "acting as [the client's] agent, will automatically transfer (or 'sweep') available cash balances in [the client's] eligible cash—including proceeds of securities transactions, dividend and interest payments, cash deposits, and other monies—into interest-bearing deposit accounts . . . ."[2] The ACSP program consists of two available programs, depending on the type of account the customer holds: (1) an Insured Cash Account program ("ICA") and (2) a Deposit Cash Account program ("DCA").

17.    For its ACSP, LPL sweeps the clients' cash into various "Program Banks." These banks have arrangements with LPL whereby they compensate LPL for the clients' cash which is "swept" into their banks.

18.    Client cash balances are swept into one or more Program Banks with a general limit into each bank being the limit of insurance coverage provided for by the Federal Deposit Insurance Corporation ("FDIC").

19.    However, if a client's cash exceeds FDIC limits at all Program Banks, then the excess amount will be deposited in the cash sweep program's "Excess Bank" without regard to any FDIC limit.

---

[2]    Insured Cash Account Disclosure Booklet, at p. 2, available at https://www.lpl.com/content/dam/lpl-www/documents/disclosures/lpl-ica-disclosure-booklet.pdf (accessed June 21, 2024).

20.     LPL fails to pay or secure for its clients a reasonable rate of interest on the cash balances in its ACSP.

21.     LPL's webpage that explains its ACSP links to the "Current Interest Rate," which forwards the client to an August 2, 2023, publication by LPL identifying its ACSP's rates.[3]

22.     For example, the applicable rates as of August 2, 2023, were:[4]

| From | To | Annual Percentage Yield |
|------|-----|------------------------|
| $0 | $149,999 | 0.35% |
| $150,000 | $299,999 | 0.4% |
| $300,000 | $499,999 | 0.45% |
| $500,000 | $749,999 | 0.50% |
| $750,000 | $1,499,999 | 0.80% |
| $1.5 million | $4,999,999 | 1.15% |
| $5 million | $9,999,999 | 1.25% |
| $10 million | and above | 2.20 % |

23.     The rates paid by LPL to its clients pursuant to its ACSP violate LPL's duties to its clients because these rates are not reasonable. LPL's misconduct

---

[3]     LPL Financial Automatic Cash Sweep Programs, available at https://www.lpl.com/disclosures/lpl-financial-fdic-insured-bank-deposit-sweep-programs.html, (accessed June 21, 2024).

[4]     LPL Insured Cash Account Current Interest Tier Rates, available at https://www.lpl.com/content/dam/lpl-www/documents/disclosures/insured-cash-account-current-interest-rate-tiers.pdf, (accessed June 21, 2024).

CLASS ACTION COMPLAINT

constitutes a breach of LPL's fiduciary duties to its clients and a violation of Regulation Best Interest, 17 CFR § 240.15l-1 (2019) (hereinafter "Reg. BI").

**B. LPL's Duties to Its Clients**

24.    LPL owes varying duties to each client based on the type of relationship it has with the client, including the following:

    a.    for all retail advisory accounts, LPL was required to act as a fiduciary to its clients, requiring it to only act for the benefit of its clients and not its own self-interest;

    b.    for all retail client accounts, regardless of whether the account was qualified or not, advisory or retail brokerage, LPL was required to always act in the "best interests" of its clients; and

    c.    for all retail retirement accounts, including traditional, Roth, and Simple Individual Retirement Accounts ("IRAs"), LPL was required under the common law fiduciary standard, Reg. BI, and other applicable federal laws to act in the best interests of its clients.

**1.    LPL's Fiduciary Duties**

25.    Because it provides financial advisory and other services to its clients, LPL must adhere to certain standards of conduct vis-a-vis its clients.

26.    For example, when LPL is acting as an Investment Adviser for actively managed funds, it owes its client a fiduciary duty. *See* Securities and Exchange

**7**

Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.") (hereinafter "Fiduciary Interpretation").

27.    "The Advisers Act establishes a federal fiduciary duty for investment advisers. This fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id.*

28.    Under this federal duty, LPL "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.*

29.    If there is a conflict between its interests and its client's interests, then LPL is also required to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*

30.    LPL "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.*

31.    LPL's fiduciary duties also include a duty of care to carry out its responsibilities in an informed and considered manner and to act as an ordinary prudent person would act in the management of his or her own affairs. In addition,

because LPL becomes a fiduciary on the basis of representations of special skills or expertise, it is under a duty to use those skills and expertise for the benefit of its clients.

### 2. LPL's Duties Under Regulation Best Interest

32.    Even where LPL is not acting as an Investment Adviser and instead plays a more passive role, it still must act in its clients' best interests under Reg. BI.

33.    While the Investment Adviser obligations apply to all investment advisory clients, Reg. BI applies only to retail investors, defined as "a natural person, or the legal representative of such person who (i) [r]eceives a recommendation of any securities transaction or investment strategy" and "(ii) [u]ses the recommendation primarily for personal, family, or household purposes." 17 C.F.R. § 240.15l-1(b)(1).

34.    Although there are technical differences between Reg. BI and an Investment Adviser's fiduciary obligations, "they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[5]

35.    Reg. BI was drafted "to draw on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the

---

[5]    *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations, available at www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers (accessed June 21, 2020).

relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320.

36.    Under Reg. BI, regardless of whether an investor chooses a broker-dealer or an investment adviser (or both), the investor "will be entitled to a recommendation . . . or advice . . . that is in the best interest of the retail investors and that does not place the interests of the firm or the financial professional ahead of the interests of the retail investor." 84 Fed. Reg. 33318, 33321.

37.    Reg. BI consists of a "General Obligation," which states, "When making a recommendation, a broker-dealer must act in the retail client's best interest and cannot place its own interests ahead of the client's interests." 84 Fed. Reg. 33318, 33320.

38.    Within the General Obligation are more specific duties, including disclosure duties and a duty to avoid and disclose conflicts of interest.

39.    These latter duties require disclosure of "all material facts relating to conflicts of interest . . . that might incline a broker-dealer to make a recommendation that is not disinterested, including, for example, conflicts associated with proprietary products, payments from third parties, and compensation arrangements." 84 Fed. Reg. 33318, 33321.

40.    Part of a broker-dealer's obligation under Reg. BI is to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether

it has a reasonable basis for making the recommendation." 84 Fed. Reg. 33318, 33321.

41.    One component of a broker-dealer's duty to disclose conflicts of interest concerns compensation. "The receipt of higher compensation for recommending some products rather than others, whether received by the broker-dealer, the associated person, or both, is a fundamental and powerful incentive to favor one product over another." 84 Fed. Reg. 33318, 33364.

42.    Thus, under Reg. BI, LPL was and is obligated to elevate its clients' interests above its own, to avoid conflicts with clients' interests, and disclose material facts concerning any conflicts that may exist.

### 3.    LPL's Duty to Secure Reasonable Interest Rates for Retirement Accounts

43.    For client cash balances maintained in retirement accounts (regardless of whether the accounts are advisory or brokerage in nature), LPL may utilize those cash balances for investments or loans but only if it pays the client a "reasonable rate" of interest on those cash balances.

44.    For example, section 4975 of the Internal Revenue Code concerns "prohibited transactions" and applies when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. § 4975.

CLASS ACTION COMPLAINT

45.     A "disqualified person" includes companies or individuals "providing services to the plan." 26 U.S.C. § 4975(e)(2)(B).

46.     Regarding these "prohibited transactions," the IRS code provides several safe harbors, one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4).

47.     Thus, while LPL is allowed to invest all or part of a client's cash balances maintained in retirement accounts, those cash balances must "bear a reasonable interest rate." 29 U.S.C. § 4975(d)(4); 26 CFR § 54.4975-6. The objective of this provision is to ensure that related party transactions—i.e., transactions between a plan sponsor (LPL) and a service provider (Program Banks)—involving retirement accounts are priced at fair market rates.

48.     Treasury regulations extend this same obligation to situations when LPL "invests plan assets in deposits in itself or its affiliates." 26 CFR § 54.5975-6(b)(3)(i). When this occurs, the client's authorization "must name" the institution and "must state that [the bank] may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id.*

49.     Similarly, and like the IRS Code, ERISA also exempts from prohibition various interested party transactions that "bear a reasonable rate of interest." 29 U.S.C. § 1108(b)(1)(D).

CLASS ACTION COMPLAINT

50.    In sum, under the common law fiduciary standard, Reg. BI, and other applicable federal laws, LPL has a duty to act in the best interests of its clients and to secure reasonable interest rates for its clients' cash balances through a reasonable cash sweep program or reasonable cash equivalents—such as government money market funds available to LPL clients.

**C. LPL Breaches Its Duties and Profits Thereby**

51.    LPL breaches its duties by failing to secure reasonable interest rates for its clients' deposits.

52.    The term "reasonable" is defined in the dictionary as being synonymous with "fair" and "proper."[6]

53.    IRS regulations define an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 CFR § 1.482-2(a)(2).

54.    In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other clients of the bank, those offered by other banks, those available from money market funds, those applicable to short-term

---

[6] *See* Reasonable, Black's Law Dictionary (12th ed.).

CLASS ACTION COMPLAINT

instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, at 34648 (June 10, 2003).

### 1.    Sweep Account Rates Paid by Other Institutions

55.    The rates offered by LPL through its ACSP are significantly lower than sweep programs at other brokerage and advisory firms. For example, the following chart compares LPL's ACSP's sweep rates with those of two comparable programs:

CLASS ACTION COMPLAINT

| Cash Balance | LPL's ACSP Rate[7] | Vanguard Sweep Rate[8] | InteractiveBrokers Sweep Rate[9] |
|---|---|---|---|
| Less than $150,000 | 0.35% | 4.6% | 4.83% |
| Between $150,000 and $299,999 | 0.40% | 4.6% | 4.83% |
| Between $300,000 and $499,999 | 0.45% | 4.6% | 4.83% |
| Between $500,00 and $749,999 | 0.50% | 4.6% | 4.83% |
| Between $750,000 and $1,499,999 | .80% | 4.6% | 4.83% |
| Between $1.5 million and $4,999,999 | 1.15% | 4.6% | 4.83% |
| Between $5 million and $9,999,999 | 1.25% | 4.6% | 4.83% |
| $10 million and above | 2.20% | 4.6% | 4.83% |

56.     Thus, other brokerage and advisory financial institutions that use sweep programs pay or secure significantly higher rates than LPL.

---

[7]     *See* LPL Insured Cash Account Current Interest Tier Rates, available at https://www.lpl.com/content/dam/lpl-www/documents/disclosures/insured-cash-account-current-interest-rate-tiers.pdf, (accessed June 21, 2024).

[8]     *See* Vanguard Cash Plus Account, available at https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (accessed June 21, 2024).

[9]     *See* Safeguard Your Assets with Our Insured Bank Deposit Sweep Program, https://www.interactivebrokers.com/en/accounts/sweep-program.php (accessed June 21, 2024); Interest Rates, available at https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php, (accessed June 21, 2024).

## 2. Money Market Fund Rates

57.    Money market fund rates also provide a benchmark for determining what constitutes a "reasonable rate."

58.    As discussed below, until recently, LPL swept its client cash into the LPL money market fund after the maximum cash levels were reached at LPL's Program Banks.

59.    Some of LPL's competitors automatically sweep any uninvested cash deposited into its clients' brokerage accounts into money market funds that earn comparably high rates of interest.

60.    For example, by default, Fidelity sweeps uninvested cash in their client's brokerage accounts into a money market fund earning approximately 5%.[10]

61.    On April 1, 2019, LPL made the decision to eliminate the option of using a money market as a cash sweep option.  As a result, client yields were reduced and LPL's profits were increased.

## 3. Violation of Duties

62.    LPL breaches its fiduciary duties and violates Reg. BI by failing to pay to or secure for its clients reasonable rates on client cash balances.

---

[10] *See* Help your cash work harder, available at https://www.fidelity.com/go/manage-cash-rising-costs, (accessed June 21, 2024).

CLASS ACTION COMPLAINT

63.    LPL further breaches its fiduciary duties and violates Reg. BI by (1) failing to make adequate disclosures to its clients; (2) failing to elevate its clients' interests above its own; (3) failing to avoid or—at the very least disclose—its conflicts of interest with its clients; (4) failing to disclose to clients other viable options that may benefit them; and (5) failing to demonstrate loyalty to its clients.

**D. LPL Benefits from Its Misconduct**

64.    LPL earns interest revenue on non-trading assets that it holds for its clients; this includes cash deposits and other capital that is not deployed for trading purposes. Much of LPL's net interest income is generated by its wealth management business—a business unit that provides investment-related services for client funds and serves as a broker-dealer for LPL clients.

65.    LPL boasts that, "We generate compelling economics on client cash balances."[11]

66.    During the rising interest rate environment from March 2022 through the present, LPL's net interest spread has grown exponentially: from 2022 to 2023 LPL's net interest income increased by 107%.

---

[11]    LPL Financial Holdings Inc. Q1 2024 Earnings Key Metrics, at p. 14, available at https://investor.lpl.com/static-files/f6bdbe29-b1df-429e-83cd-6851fc81c19b, (accessed June 21, 2024).

67.    LPL earns revenue under its ACSP based on agreements with its Program Banks, where each bank compensates LPL based on the average daily deposit balances at the Program Bank, and that total compensation paid is based on an annual interest rate of up to an average of 6%.

68.    For clients that have deposited cash with the company, however, LPL pays only the paltry yield reflected in its ACSP. The difference between what LPL earns on the deposits and what it pays its clients is the company's net interest income.

69.    LPL's ACSP's cash holdings represent the largest percentage of client cash balances for LPL's clients. Since the first quarter of 2022, LPL's clients held an average of $48.6 billion in its ACSP:[12]

---

[12]    *Id.*

CLASS ACTION COMPLAINT



70.    LPL also earns an additional $30 million in profits each time the Federal Reserve increases interest rates:[13]

---

[13]    *Id.*

## Interest Rate Impact

- Since Q1 2022, as the Fed started to increase interest rates, our deposit beta averaged ~15%
  - Deposit betas averaged ~2.5% over the first 4 hikes, and ~20% on subsequent hikes, including a peak of ~25% on the final hike
- Applying historical deposit betas to our current cash balances would yield:
  - ~$30M of Annual Gross Profit* per subsequent rate adjustment, at a ~25% deposit beta

71.    LPL is continuing to increase its own yields on its clients' cash balances in the ACSP, while continuing to maintain unreasonably low interest rates for its clients.

72.    For the first quarter of 2024, LPL secured for itself a half billion dollars of fixed rate balances in the ICA portion of its ACSP at an interest rate of 4.45%—an increase of 1.05% in the interest rate from the prior period.[14]

73.    Thus, LPL is continuing to increase the spread between its huge revenue numbers and the returns it pays to or secures for its clients.

74.    Fluctuating interest rates present a revenue risk for LPL. According to the company's own analysis, a change in interest rates may cause significant change in the company's net interest income derived specifically from its ACSP.  As LPL

---

[14]    *Id.*

CLASS ACTION COMPLAINT

has explained: "[o]ur revenue is exposed to interest rate risk primarily from changes in fees payable to us from banks participating in our client cash programs and changes in interest income earned on deposits."[15]

75.    Changes in interest rates also mean that LPL's clients may decrease their cash deposits. According to LPL, if interest rates decline, it could experience "decreases in client cash balances or mix shifts among the current or future deposit sweep vehicles . . . ."[16]

76.    Thus, LPL has a significant financial interest in (1) not paying its clients a reasonable interest rate and keeping as much of the "spread" as it can, and simultaneously (2) not disclosing to its clients the unreasonable interest rates paid by the company (as well as the company's inherent conflicts of interest), lest the clients pursue accounts with more lucrative rates at other institutions.

## V.    CLASS ACTION ALLEGATIONS

77.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

78.    Plaintiff brings this class action and seeks certification of the following Class:

> **Retail clients of LPL who had cash deposits or balances in LPL's Automatic Cash Sweep Program.**

---

[15]    LPL Annual Report, at p. 15.

[16]    *Id.*

CLASS ACTION COMPLAINT

79.    Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

80.    Excluded from the Class are governmental entities, institutional and other non-retail investors; LPL and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

81.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

82.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, LPL's wealth management services provide financial planning and advisory services to over 4.5 million client accounts through the work of over 22,000 financial advisors.[17] Accordingly, the Class satisfies

---

[17]    About LPL Financial, available at https://www.lpl.com/about-us.html#:~:text=San%20Diego%2C%20CA,the%20University%20Town%20Center%20area (accessed June 21, 2024).

CLASS ACTION COMPLAINT

the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### Existence and Predominance of Common Questions of Law and Fact
### Rule 23(a)(2), 23(b)(3)

83.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    whether LPL's interest rates are "reasonable";

b.    the existence of LPL's fiduciary duties to the Class, and whether LPL violated those duties;

c.    the duties imposed on LPL by Reg. BI, and whether LPL violated those duties;

d.    the duties imposed on LPL related to its IRA programs offered to retail clients), and whether LPL violated those duties;

e.    whether LPL was unjustly enriched by its wrongful conduct;

f.    whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

g.    whether and to what extent Class members are entitled to damages and other monetary relief; and

CLASS ACTION COMPLAINT

h.   whether and to what extent Class members are entitled to attorneys' fees and costs.

### Typicality
### Rule 23(a)(3)

84.   Plaintiff's claims are typical of the claims of the Class because he was a retail account holder with LPL that was paid an unreasonable interest rate by the company. Thus, Plaintiff's claims are typical of the claims of the Class members as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

### Adequacy of Representation
### Rule 23(a)(4)

85.   Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

### Superiority
### Rule 23(b)(3)

86.   A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against

CLASS ACTION COMPLAINT

Defendants. It would thus be virtually impossible for Class members, on an individual basis, to obtain effective redress for the wrongs done them.

87.     Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

88.     Superiority is particularly satisfied in a circumstance such as this where the law of a single state will apply. Under the uniform contract terms with LPL, the law of Massachusetts will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

89.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant;

CLASS ACTION COMPLAINT

b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Brought on behalf of the Class against All Defendants**

90.    Plaintiff, on behalf of himself and the Class, hereby re-alleges the paragraphs above as if fully set forth herein.

91.    Under the Investment Advisers Act and at common law, LPL owed fiduciary duties to the Class members who maintained managed accounts within the purview of the Investment Advisers Act.

92.    Under Reg. BI, LPL owed duties to the Class members who maintained non-managed accounts (including IRAs), and those duties are tantamount to fiduciary obligations for the purposes of this litigation.

93.    LPL's duties include, but are not limited to:

CLASS ACTION COMPLAINT

a.  a duty of undivided loyalty;

b.  a duty to act in the best interests of its clients;

c.  a duty of care;

d.  a duty not to place LPL's interests above those of its clients;

e.  a duty to avoid conflicts of interest; and

f.  a duty to disclose any conflicts of interest.

94.    LPL violated each of the foregoing duties when it (1) failed to pay the Class members a reasonable rate of interest; (2) failed to act in the Class's best interests by not providing a reasonable default for cash balances that paid its clients a fair and reasonable rate of interest on cash balances; (3) placed its own interests in realizing financial gain from net interest income ahead of the Class's interest in obtaining a reasonable rate of interest; (4) maintained and failed to disclose its conflict of interest in securing increased net interest income at the expense of its clients.

95.    LPL's conduct damaged Plaintiff and the Class.

96.    Plaintiff, individually and on behalf of the Class, seeks all damages permitted by law.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**Brought on behalf of the Class against All Defendants**

97.    Plaintiff, on behalf of himself and the Class, hereby re-alleges the

**27**

paragraphs above as if fully set forth herein.

98.    Plaintiff conferred a benefit upon LPL when, as a result of LPL's wrongful conduct, Plaintiff and the Class received lower interest payments on their cash and other deposits than they would have in a reasonable and fair market.

99.    As a result of LPL's wrongful conduct, LPL was unjustly enriched because it received significantly greater net interest income than it would have but for its wrongful conduct.

100.    LPL knew of the benefit it received from Plaintiff and the Class, and it appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the Class.

101.    It would be inequitable and unjust for LPL to retain these wrongfully obtained profits.

102.    LPL's retention of this wrongfully-obtained net interest income would violate the fundamental principles of justice, equity, and good conscience.

103.    Plaintiff and the Class are entitled to restitution and disgorgement of the profits unjustly obtained, plus interest.

## VII.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, demands judgment and relief as follows:

CLASS ACTION COMPLAINT

1.    For an order certifying the proposed Class, and appointing Plaintiff and his counsel to represent the proposed Class;

2.    For an order awarding Plaintiff and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

3.    For an order awarding Plaintiff and Class members restitution, disgorgement, or such other and further relief as the Court deems proper; and

4.    For an order awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII.    JURY TRIAL DEMAND

Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues so triable.

DATED: July 31, 2024

*/s/ Deborah R. Rosenthal*
Deborah Rosenthal Cal. Bar No. 184241
**SIMMONS HANLY CONROY LLP**
455 Market Street
Suite #1270
San Francisco, California 94105
Telephone: (415) 536-3986
Facsimile: (415) 537-4120

and

CLASS ACTION COMPLAINT

Thomas I. Sheridan, III
Sona R. Shah
**SIMMONS HANLY CONROY LLP**
112 Madison Avenue
New York, NY 10016
Telephone: (212) 784-6404
tsheridan@simmonsfirm.com
sshah@simmonsfirm.com

        and

Matthew L. Dameron
Clinton J. Mann
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
Facsimile: (816) 945-7118
matt@williamsdirks.com
cmann@williamsdirks.com

        and

Bruce D. Oakes
Richard B. Fosher
**OAKES & FOSHER, LLC**
1401 Brentwood Boulevard, Suite 250
Saint Louis, Missouri 63144
Telephone: (314) 428-7600
Facsimile: (314) 428-7604
boakes@oakesfosher.com
rfosher@oakesfosher.com

***Counsel for Plaintiff and the Proposed Class***

CLASS ACTION COMPLAINT